## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAIRO LIZARAU, derivatively on behalf of EVOLUS, INC.,<br><br>      Plaintiff,<br><br>vs.<br><br>DAVID MOATAZEDI, RUI AVELAR, LAUREN P. SILVERNAIL, VIKRAM MALIK, SIMONE BLANK, PETER C. FARRELL, DAVID GILL, BOSUN HAU, ROBERT HAYMAN, KARAH PARSCHAUER, and KRISTINE ROMINE,<br><br>      Defendants,<br><br>and<br><br>EVOLUS, INC.,<br><br>      Nominal Defendant. | Case No.:   1:20-cv-9986<br><br><br>**DEMAND FOR JURY TRIAL** |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## <u>INTRODUCTION</u>

Plaintiff Jairo Lizarau ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Evolus, Inc. ("Evolus" or the "Company"), files this Verified Shareholder Derivative Complaint against David Moatazedi ("Moatazedi"), Rui Avelar ("Avelar"), Lauren P. Silvernail ("Silvernail"), Vikram Malik ("Malik"), Simone Blank ("Blank"), Peter C. Farrell ("Farrell"), David Gill ("Gill"), Bosun Hau ("Hau"), Robert Hayman ("Hayman"), Karah Parschauer ("Parschauer"), and Kristine Romine ("Romine") (collectively, the "Individual Defendants," and together with Evolus, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Evolus, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Section 14(a) of the Securities Exchange Act of

1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Evolus, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.       This is a shareholder derivative action that seeks to remedy wrongdoing committed by Evolus' directors and officers from February 1, 2019 through July 6, 2020, both dates inclusive (the "Relevant Period").

2.       Evolus is a California-based performance beauty and medical aesthetics company that develops and commercializes products in the self-pay aesthetic market. Evolus touts its first and only product, Jeuveau® (DWP-450) (prabotulinumtoxinA) ("Jeuveau"), as a "proprietary" purified botulinum toxin type A formulation designated for the temporary improvement in the appearance of moderate to severe frown lines in adults. Jeuveau was intended by Evolus to be introduced to the United States self-pay aesthetic market as a cost-effective alternative to Allergan, Inc.'s ("Allergan") flagship product Botox® ("Botox").

3.       In therapeutic use, small doses of purified botulinum toxin are injected into muscles to block signals from the nerves, i.e. the release of acetylcholine from motor neurons, to the muscles, and, in so doing, inhibit muscle contraction. The cosmetic form of botulinum toxin is

Botox, a commonly used injectable to temporarily diminish or remove facial lines and wrinkles. Botox is manufactured by Allergan and currently distributed by Allergan's partner, Medytox, Inc. ("Medytox")—a Korean biopharmaceutical company.

4.     Evolus was incorporated in the State of Delaware in November 2012. In 2014, the Company became a wholly-owned subsidiary of AEON Biopharma, Inc. (formerly, Alphaeon Corporation) ("Alphaeon"), prior to going public in February 2018. In 2019, Alphaeon transferred its shares in the Company to Alphaeon 1, LLC ("Alphaeon 1"). The Company no longer considers itself a controlled company, effective May 2019.

5.     Although, Evolus began negotiating with Medytox in January 2013 for the supply and license of Meditoxin, Medytox's botulinum toxin drug that the Company would market in the United States to treat skin wrinkles, Evolus entered into a distribution agreement with Daewoong Pharmaceuticals Co., Ltd., ("Daewoong"), a South Korean pharmaceutical manufacturer (the "Daewoong Agreement").

6.     Undoubtedly, the Company's choice to designate Daewoong, the former distributor of Allergan's Botox from 1995 until January 2009, as the distributor of Jeuveau, rather than Medytox, the current distributor of Botox was highly calculated and motivated in large part due to Daewoong's apparent misappropriation of Allergan's and Medytox's proprietary trade secrets related to Botox. Specifically, shortly after Daewoong's agreement with Allergan ended, Daewoong hired a former Medytox employee who had access to Medytox's proprietary botulinum toxin strain. Not long after that, Daewoong filed a claim for a new *Clostridium botulinum* toxin type A neurotoxin drug with the Korean Ministry of Food and Drug Safety ("Korean Ministry"), asserting that it had discovered a strain that it isolated from Korean soil.

7.     Thereafter, Evolus began hiring former Allergan executives including Defendant Moatazedi and five others with knowledge of their largest competitor's marketing and sales strategy of Botox to prepare for an aggressive marketing campaign for Jeuveau to seize a significant portion of Allergan's market share that would commence upon the United States Food and Drug Administration's ("FDA") approval of the drug on February 1, 2019.

8.     In the meantime, while Evolus was representing to investors in, among other things, various quarterly and annual reports filed with the SEC that Jeuveau was "proprietary" in nature and touting Jeuveau's capacity to capture market share and increase the Company's revenue growth, the Company faced litigation that challenged the intellectual property underlying its sole product, Jeuveau, and that alleged Evolus, through its partnership with Daewoong, misappropriated certain trade secrets related to the botulinum toxin strain and the manufacturing process. Particularly, in the face of mounting evidence against the Company that had been presented before the International Trade Commission ("ITC") by Allergan and Medytox in an action filed against, among others, Evolus which sought, *inter alia*, the issuance of an exclusion order forbidding entry of Jeuveau into the United States, the Individual Defendants continued to downplay and to cause the Company to downplay the risks associated with the ITC Action (defined below) and reassure investors of the Company's confidence in its intellectual property.

9.     Notably, on March 4, 2020, Medytox issued statements announcing that a staff attorney at the ITC submitted an opinion supporting Medytox's claim that Daewoong and Evolus misappropriated its trade secrets. In response, rather than acknowledging the merit of Medytox's statements and the grave risk the action posed to the Company's viability in light of the actual weight of evidence that Allergan and Medytox presented, the Individual Defendants caused Evolus

to dismiss Medytox's statements as "speculative" and "intended to create confusion" and to reassure investors that the Company remains "confident" in its intellectual property.

10. On this news, the price of the Company's stock dropped from $7.43 per share at the close of trading on March 4, 2020, to $7.01 per share at the close of trading on March 5, 2020, representing a decrease of approximately 5.7%, on heavy trading volume.

11. The truth emerged on July 6, 2020, when the ITC issued an initial determination finding that Evolus and Daewoong had, in fact, misappropriated Medytox's trade secrets and recommended a limited exclusion order preventing Evolus from importing Jeuveau for ten years and a cease and desist order prohibiting Evolus from marketing and selling Jeuveau in the United States during that same time period.

12. On this news, the price of the Company's stock plunged from $5.32 per share at the close of trading on July 6, 2020, to $3.35 per share at the close of trading on July 8, 2020, representing a loss in value of over 37%, on heavy trading volume.

13. Throughout the Relevant Period, the Individual Defendants caused the Company to misappropriate Medytox's trade secrets related to the bacteria strain and the manufacturing process Evolus used to develop Jeuveau (the "Misappropriation").

14. In breach of their fiduciary duties, the Individual Defendants permitted the Misappropriation, engaged in and caused the Company to engage in the Misappropriation, and failed to maintain adequate controls.

15. During the Relevant Period, the Individual Defendants further breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made

and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the genuine origin of botulinum toxin bacterial strain and the manufacturing process employed to create Jeuveau were misappropriated from Medytox; (2) ample evidence was submitted on record in the ITC Action to support a finding that the Company misappropriated certain trade secrets relating to the botulinum toxin strain and the manufacturing process for the invention of Jeuveau; (3) consequently, there was a serious risk that Evolus would be subject to regulatory and/or court action, banning the import, marketing, and sale of Jeuveau and that the Company's ability to monetize Jeuveau in the United States would be significantly impaired as a result; (4) all proceeds produced from the commercialization of Jeuveau were the consequence of the Company's misappropriation of certain of Allergan's and Medytox's trade secrets relating to the botulinum toxin strain and the manufacturing process; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

16.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

17.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

18.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's President and Chief Executive Officer ("CEO"), the Company's Chief Medical Officer ("CMO"), and the Company's Chief Financial Officer ("CFO") and Executive Vice President, Corporate Development to being named as defendants in a

consolidated federal securities fraud class action lawsuit pending in this Court (the "Securities Class Action") and subjected the Company to being named as a defendant in the Medytox Action (defined below) and the ITC Action, the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

19.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's current directors, of the substantial likelihood of the President and CEO's, CMO's, and CFO's liability in the Securities Class Action and the current directors' liability in this derivative action, and of their not being disinterested or independent directors, a majority of the Evolus Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

21.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

22.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

25.     Plaintiff is a current shareholder of Evolus. Plaintiff has continuously held Evolus common stock since purchasing it during the beginning of the Relevant Period.

### Nominal Defendant Evolus

26.     Evolus is a Delaware corporation with its principal executive offices located at 520 Newport Center Dr., Suite 1200, Newport Beach, California 92660. Evolus' shares trade on the NASDAQ under the ticker symbol "EOLS."

### Defendant Moatazedi

27.     Defendant Moatazedi has served as the Company's President and CEO and as a Company director since May 2018. Previously, Defendant Moatazedi worked, in various capacities, including as the Head of the Medical Aesthetic Division in the United States, at Allergan from March 2005 to May 2018. According to the Company's Schedule 14A filed with the SEC on March 17, 2020 (the "2020 Proxy Statement"), as of March 13, 2020, Defendant Moatazedi beneficially owned 622,260 shares of the Company's common stock, which represented 1.8% of outstanding shares of Company stock as of that date. Given that the price per share of the Company's common stock on March 13, 2020 was $4.96, Defendant Moatazedi owned over $3 million worth of Evolus stock.

28.     For the fiscal year ended December 31, 2019, Defendant Moatazedi received $2,278,813 in compensation from the Company, which consisted of $550,000 in salary, $1,169,813 in option awards, $555,500 in non-equity incentive plan compensation, and $3,500 in all other compensation.

29.     The Company's 2020 Proxy Statement stated the following about Defendant Moatazedi:

**David Moatazedi**
Age: 42
Evolus Board Service
- Tenure: 22 months (May 2018)

**Professional Experience**
Mr. Moatazedi has served as our President, Chief Executive Officer and as a member of our board of directors, since May 2018. Prior to that time, Mr. Moatazedi was the Senior Vice President at Allergan, Inc., or Allergan, and division head of the U.S. Medical Aesthetics division, which includes facial aesthetics, plastic surgery, regenerative medicine, body contouring, and skin care products from March 2016 to May 2018. Since March 2017, Mr. Moatazedi has served as a member of the board of directors of Obalon Therapeutics, Inc., a public medical device company focused on developing and commercializing medical devices to treat obese and overweight people by facilitating weight loss. Mr. Moatazedi has worked in various leadership capacities within Allergan since March 2005, including as Vice President, Sales and Marketing of the U.S. Facial Aesthetics division from August 2014 to March 2016 and Vice President, Sales and Market of the U.S. Plastic Surgery division from February 2013 to August 2014. Prior to Allergan, Mr. Moatazedi was a district manager at Novartis Pharmaceuticals for the Dermatology division. Mr. Moatazedi holds an M.B.A. from Pepperdine University and a B.A. from California State University, Long Beach.

**Relevant Skills**
We believe that Mr. Moatazedi's extensive leadership experience, his position as President and Chief Executive Officer of Evolus, knowledge of the Company and industry knowledge qualify him to serve on the board of directors.

**Other Public Board Service**
- Obalon Therapeutics, Inc. | March 2017-present[.]

**Defendant Avelar**

30.     Defendant Avelar has served as the Company's CMO since January 2014, and as the Head of Research and Development since August 2018. According to the 2020 Proxy Statement, as of March 13, 2020, Defendant Avelar beneficially owned 175,634 shares of the Company's common stock, which represented less than 1% of outstanding shares of Company stock as of that date. Given that the price per share of the Company's common stock on March 13, 2020 was $4.96, Defendant Avelar owned approximately $871,145 worth of Evolus stock.

31.     For the fiscal year ended December 31, 2019, Defendant Avelar received $1,836,610 in compensation from the Company, which consisted of $400,000 in salary, $561,510 in option awards, $861,600 in non-equity incentive plan compensation, and $13,500 in all other compensation.

32.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Avelar made the following sale of Company stock:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|------|------------------|----------------------|----------|
| 01/07/2020 | 39,442 | $10.71 | $422,423.82 |

33.     His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

34.     The Company's 2020 Proxy Statement stated the following about Defendant Avelar:

> Dr. Avelar has served as our Chief Medical Officer since January 2014 and was appointed to the additional position of Head of Research and Development in August 2018. From January 2014 to February 2018, Dr. Avelar also served as the

Chief Medical Officer of Alphaeon. From March 2011 to December 2013, he served as Chief Medical Officer of Allergan Medical, where he was responsible for clinical development, clinical operations, safety, medical writing, biostatistics and regulatory matters. Dr. Avelar holds a M.D. from the University of Toronto and has received training accreditation in Sports Medicine from the Canadian Academy of Sports Medicine.

**Defendant Silvernail**

35.    Defendant Silvernail has served as the Company's CFO and Executive Vice President, Corporate Development since May 2018. According to the 2020 Proxy Statement, as of March 13, 2020, Defendant Silvernail beneficially owned 66,138 shares of the Company's common stock. Given that the price per share of the Company's common stock on March 13, 2020 was $4.96, Defendant Silvernail owned over $328,044 worth of Evolus stock.

36.    For the fiscal year ended December 31, 2019, Defendant Silvernail received $1,021,333 in compensation from the Company, which consisted of $425,000 in salary, $421,133 in option awards, $171,700 in non-equity incentive plan compensation, and $3,500 in all other compensation.

37.    During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Silvernail made the following sale of Company stock:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|------|------------------|----------------------|----------|
| 05/31/2019 | 2,612 | $13.54 | $35,366.48 |

38.    Her insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

39.    The Company's 2020 Proxy Statement stated the following about Defendant Silvernail:

> Mrs. Silvernail has served as our Chief Financial Officer and Executive Vice President, Corporate Development since May 2018. Prior to that time, Mrs. Silvernail served as the Chief Financial Officer and Chief Business Officer of Revance Therapeutics, Inc., or Revance, a pharmaceutical research and development company, from December 2015 to May 2018 and as Revance's Chief Financial Officer and Executive Vice President, Corporate Development from March 2013 to December 2015. From 2003 to 2012, Mrs. Silvernail was Chief Financial Officer and Vice President of Corporate Development at ISTA Pharmaceuticals, Inc., a commercial pharmaceutical company. From 1995 to 2003, Mrs. Silvernail served in various operating and corporate development positions with Allergan, including Vice President, Business Development. Prior to joining Allergan, Mrs. Silvernail worked at Glenwood Ventures, an investment firm, as a General Partner. She currently serves on the board of directors and as a member of the audit and compensation committees and as chairwoman of the corporate governance committee of Nicox S.A. Mrs. Silvernail holds a B.A. in Biophysics from the University of California, Berkeley and an M.B.A. from the Anderson Graduate School of Management at the University of California, Los Angeles.

**Defendant Malik**

40.    Defendant Malik has served as a Company director and Chairman of the Board since January 2018. According to the 2020 Proxy Statement, as of March 13, 2020, Defendant Malik beneficially owned 1,354,575 shares of the Company's common stock, which represented approximately 4% of outstanding shares of Company stock as of that date. Given that the price per share of the Company's common stock on March 13, 2020 was $4.96, Defendant Malik owned over $6.7 million worth of Evolus stock.

41.    For the fiscal year ended December 31, 2019, Defendant Malik received $221,698 in compensation from the Company, which consisted of $86,000 in fees earned or paid in cash and $135,698 in option awards.

42.    The Company's 2020 Proxy Statement stated the following about Defendant Malik:

Vikram Malik
Age: 57
Evolus Board Service

- Tenure: 26 months (January 2018)

**Professional Experience**
Mr. Malik has served as a member and the Chairman of our board of directors since January 2018. Mr. Malik has served as a member of Alphaeon's board of directors since April 2014 and of the board of managers of Alphaeon 1, LLC since January 2020. Since May 2013, Mr. Malik has served as the Managing Partner of Strathspey Crown Holdings Group, LLC. From August 2011 to May 2013, Mr. Malik served as Vice Chairman, Investment Banking for Deutsche Bank Securities, Inc. From November 2010 to August 2011, Mr. Malik served as a Managing Director in the Healthcare Corporate and Investment Banking Group of Merrill Lynch, Pierce, Fenner & Smith Incorporated. From June 2000 to November 2010, Mr. Malik served as the Managing Director of Banc of America Securities, LLC. Mr. Malik received a B.A. in Economics from Delhi University and an M.B.A. from Boston University Graduate School of Management.

**Relevant Skills**
We believe Mr. Malik's extensive experience in the investment banking and financial services industry qualifies him to serve on the board of directors.

**Other Public Board Service**
- N/A[.]

**Defendant Blank**

43.     Defendant Blank has served as a Company director since January 2018. She also served as Chairwoman of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee, until she resigned from those committee positions effective June 30, 2019. According to the 2020 Proxy Statement, as of March 13, 2020, Defendant Blank beneficially owned 963,061 shares of the Company's common stock, which represented approximately 2.9% of outstanding shares of Company stock as of that date. Given that the price per share of the Company's common stock on March 13, 2020 was $4.96, Defendant Blank owned over $4.7 million worth of Evolus stock.

44.     For the fiscal year ended December 31, 2019, Defendant Blank received $185,698 in compensation from the Company, which consisted of $50,000 in fees earned or paid in cash and $135,698 in option awards.

45.     The Company's 2020 Proxy Statement stated the following about Defendant Blank:

**Simone Blank**
Age: 57
Evolus Board Service
• Tenure: 26 months (January 2018)

**Professional Experience**
Ms. Blank has served as a member of our board of directors since January 2018. Ms. Blank has served as the chairwoman of the board of directors of Alphaeon since July 2016 and on the board of managers of Alphaeon 1, LLC since January 2020. Ms. Blank is also the co-owner of Dental Innovations BVBA a private investment company. Since 2013, Ms. Blank has served as a member of the board of directors of several private healthcare companies. From May 2006 to October 2013, Ms. Blank served as a member of the board of directors of Sirona Dental Systems Inc., or Sirona, a dental technology manufacturer previously listed on Nasdaq. From July 1999 to October 2013, Ms. Blank served as Executive Vice President and Chief Financial Officer of Sirona. Prior to July 1999, Ms. Blank was an engagement manager in the merger and acquisition transaction group of PricewaterhouseCoopers after having gained global financial experience as a certified public accountant and tax advisor. Ms. Blank received a M.Sc. in Economics from the University of Duisburg, Germany.

**Relevant Skills**
We believe Ms. Blank's extensive business, finance, and leadership experience qualifies her to serve on the board of directors.

**Other Public Board Service**
• N/A[.]

**<u>Defendant Farrell</u>**

46.     Defendant Farrell has served as a Company director since July 2019. He also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of March 13, 2020, Defendant Farrell beneficially owned 5,865 shares of the Company's common stock. Given that the price per share of the Company's common stock on March 13, 2020 was $4.96, Defendant Farrell owned over $29,090 worth of Evolus stock.

47.     For the fiscal year ended December 31, 2019, Defendant Farrell received $248,474 in compensation from the Company, which consisted of $18,478 in fees earned or paid in cash and $229,996 in option awards.

48.     The Company's 2020 Proxy Statement stated the following about Defendant Farrell:

**Peter Farrell, Ph.D., D.Sc.**

**INDEPENDENT**
Age: 77
Evolus Board Service
- Tenure: 7 months (July 2019)
- Nominating and Corporate Governance Committee

**Professional Experience**
Dr. Farrell has served as a member of our board of directors since July 2019. Dr. Farrell is the founding Chairman of ResMed Inc., a leading developer and manufacturer of medical equipment for the diagnosis and treatment of sleep-disordered breathing. Dr. Farrell has been a Director and Chairman of the Board of Resmed since its inception in June 1989. He served as Chief Executive Officer of ResMed from 1990 to 2007 and again from February 2011 until March 2013. From March 2013 through December 2013, Dr. Farrell served as Executive Chairman of ResMed, and, in January 2014, he became non-executive Chairman. Since May 2018, Dr. Farrell has served as the Chairman of the Board of Arcturus Therapeutics, Ltd. From January 2005 to May 2018, Dr. Farrell served on the board of directors of Nuvasive, Inc. Dr. Farrell holds bachelor's and master's degrees in chemical engineering from the University of Sydney and the Massachusetts Institute of Technology, a Ph.D. in bioengineering from the University of Washington, Seattle and a Doctor of Science from the University of New South Wales for research related to dialysis and renal medicine.

**Relevant Skills**
We believe Dr. Farrell's extensive executive experience in the life science industry qualifies him to serve on the board of directors.

**Other Public Board Service**
- Resmed, Inc. | June 1989-present
- Arcturus Therapeutics Holdings, Inc. | May 2018-present[.]

**Defendant Gill**

49.     Defendant Gill has served as a Company director since February 2018. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of March 13, 2020, Defendant Gill beneficially owned 48,061 shares of the Company's common stock. Given that the price per share of the Company's common stock on March 13, 2020 was $4.96, Defendant Gill owned over $238,382 worth of Evolus stock.

50.     For the fiscal year ended December 31, 2019, Defendant Gill received $201,698 in compensation from the Company, which consisted of $66,000 in fees earned or paid in cash and $135,698 in option awards.

51.     The Company's 2020 Proxy Statement stated the following about Defendant Gill:

**David Gill**

**INDEPENDENT**

Age: 65

Evolus Board Service
- Tenure: 25 months (February 2018)
- Audit Committee (Chair)
- Compensation Committee

**Professional Experience**

Mr. Gill has served as a member of our board of directors since February 2018. Since April 2012 Mr. Gill has served as a director of Melinta Therapeutics, Inc (f/k/a Cempra Inc.) and since August 2019 he has served as its chairman of the board of directors. Mr. Gill also currently serves as a director of Y-mAbs Therapeutics, Inc,. Strongbridge Biopharma, PLC., and STRATA Skin Sciences, Inc. Previously he served on the board of directors of Histogenics, Inc. from January 2015 to July 2019. From May to November 2015, Mr. Gill served as the President and Chief Financial Officer of EndoChoice, Inc., a medical device company focused on gastrointestinal disease. Mr. Gill joined EndoChoice, Inc. as Chief Financial Officer in August 2014 and was subsequently appointed President in 2015. From February 2011 to August 2013, he served as the Chief Financial Officer of INC Research, now known as Syneos Health, a clinical research organization. Earlier in his career, Mr. Gill served in a variety of senior executive leadership roles for several publicly-traded companies, including NxStage Medical, Inc., CTI Molecular Imaging, Inc., Interland Inc. and Novoste Corporation. Mr. Gill

holds a B.S. in Accounting from Wake Forest University and an M.B.A. from Emory University, and is a certified public accountant (inactive).

**Relevant Skills**
We believe that Mr. Gill's extensive experience as an executive in the life sciences industry and his prior service as a senior-level executive in mature life sciences companies qualifies him to serve on the board of directors.

**Other Public Board Service**
- Strata Skin Sciences, Inc. | June 2018-present
- Y-mAbs Therapeutics, Inc. | December 2017-present
- Strongbridge Pharma PLC | September 2019-present
- Melinta Therapeutics, Inc. | April 2012-present[.]

**Defendant Hau**

52.     Defendant Hau served as a Company director from January 2018 until he resigned effective April 15, 2020. He also served as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. According to the 2020 Proxy Statement, as of March 13, 2020, Defendant Hau beneficially owned 49,514 shares of the Company's common stock. Given that the price per share of the Company's common stock on March 13, 2020 was $4.96, Defendant Hau owned over $245,589 worth of Evolus stock.

53.     For the fiscal year ended December 31, 2019, Defendant Hau received $193,198 in compensation from the Company, which consisted of $57,500 in fees earned or paid in cash and $135,698 in option awards.

54.     The Company's 2020 Proxy Statement stated the following about Defendant Hau:

**Bosun Hau**
**INDEPENDENT**
Age: 41
Evolus Board Service
- Tenure: 26 months (January 2018)
- Audit Committee
- Nominating and Corporate Governance Committee (Chair)

**Professional Experience**

Mr. Hau has served as a member of our board of directors since January 2018. Since April 2019, Bosun Hau has served as a Managing Director and Co-Head of Private Equity at Tybourne Capital Management, a Hong Kong based global public and private equity investment management firm. From October 2015 to April 2019, Mr. Hau served as a Managing Director and Partner at Sailing Capital, a Hong Kong and Shanghai based global private equity firm. From August 2009 to October 2015, Mr. Hau served as a Partner of MVM Partners LLP, a Boston and London based healthcare investment firm. From 2008 to 2009, Mr. Hau served as a management consultant with McKinsey & Company in Southeast Asia and as an early stage biotechnology investor with S.R. One Ltd, GlaxoSmithKline's corporate venture group. From July 2004 to August 2007, Mr. Hau served as an equity research analyst covering the medical device and pharmaceutical industries for JP Morgan Securities, Inc. and Prudential Securities, Inc. Mr. Hau started his career in sales and marketing at Eli Lilly & Company. Mr. Hau received a B.S. in Molecular and Cellular Biology, a B.S.H.S. in Physiological Sciences and a B.A. in Psychology from the University of Arizona, an M.Sc. in Biotechnology from Johns Hopkins University and an M.B.A in Finance and Health Management from the Wharton School at the University of Pennsylvania.

**Relevant Skills**
We believe Mr. Hau's extensive experience in the venture capital, private equity and financial services industries qualifies him to serve on the board of the directors.

**Other Public Board Service**
- Exicure, Inc. | August 2019-present
- Bicycle Therapeutics plc | May 2019-June 30, 2020 (announced resignation date)[.]

### **Defendant Hayman**

55.     Defendant Hayman has served as a Company director since January 2018. He also serves as Chair of the Compensation Committee. Previously, he served on the Audit Committee. According to the 2020 Proxy Statement, as of March 13, 2020, Defendant Hayman beneficially owned 39,474 shares of the Company's common stock. Given that the price per share of the Company's common stock on March 13, 2020 was $4.96, Defendant Hayman owned over $195,791 worth of Evolus stock.

56.     For the fiscal year ended December 31, 2019, Defendant Hayman received $190,698 in compensation from the Company, which consisted of $55,000 in fees earned or paid in cash and $135,698 in option awards.

57.     The Company's 2020 Proxy Statement stated the following about Defendant Hayman:

**Robert Hayman**
**INDEPENDENT**
Age: 61
Evolus Board Service
- Tenure: 26 months (January 2018)
- Compensation Committee (Chair)

**Professional Experience**
Mr. Hayman has served as a member of our board of directors since January 2018. From April 2014 to February 2018, Mr. Hayman served as a member of Alphaeon's board of directors. Since 2011, Mr. Hayman has served as the owner and Chief Executive Officer of Hayman Properties, a real estate investment and development business. Since 2015, Mr. Hayman has served as Principal, Chairman and Chief Executive Officer of Perimetrics, LLC, a dental diagnostic service company. Since April 2008, Mr. Hayman served as Principal at Common Sense Concepts, LLC, a dental device development company. From 1993 to February 2008, Mr. Hayman served as the co-founder, Chief Executive Officer and Chairman of Discus Dental, Inc. Mr. Hayman attended the Masters Degree program in Psychology at Pepperdine University, and received a B.S. in Business Administration from Boston University.

**Relevant Skills**
We believe Mr. Hayman's extensive business and leadership experience qualifies him to serve on the board of directors.

**Other Public Board Service**
- N/A[.]

**Defendant Parschauer**

58.     Defendant Parschauer has served as a Company director since July 2019. She also serves as the Chair of the Nominating and Corporate Governance Committee, as a member of the Audit Committee, and as a member of the Compensation Committee. According to the 2020 Proxy

Statement, as of March 13, 2020, Defendant Parschauer beneficially owned 5,865 shares of the Company's common stock. Given that the price per share of the Company's common stock on March 13, 2020 was $4.96, Defendant Parschauer owned over $29,090 worth of Evolus stock.

59.     For the fiscal year ended December 31, 2019, Defendant Parschauer received $248,474 in compensation from the Company, which consisted of $18,478 in fees earned or paid in cash and $229,996 in option awards.

60.     The Company's 2020 Proxy Statement stated the following about Defendant Parschauer:

**Karah Parschauer**
**INDEPENDENT**
Age: 42
Evolus Board Service
- Tenure: 7 months (July 2019)
- Audit Committee
- Compensation Committee
- Nominating and Corporate Governance Committee

**Professional Experience**
Karah Parschauer has served as a member of our board of directors since July 2019. Since June 2016, Mrs. Parschauer has served as General Counsel and Executive Vice President of Ultragenyx Pharmaceutical, Inc, or Ultragenyx. Since June 2019, Mrs. Parschauer has served on the Board of Directors of Arcturus Therapeutics, Ltd. Prior to Ultragenyx, Mrs. Parschauer served in various executive capacities, and most recently as Vice President, Associate General Counsel, at Allergan plc, a pharmaceutical company, from June 2005 until June 2016. Prior to Allergan, Mrs. Parschauer was an attorney at Latham & Watkins LLP, where she practiced in the areas of mergers and acquisitions, securities offerings, and corporate governance. Mrs. Parschauer holds a B.A. in Biology from Miami University and a J.D. from Harvard Law School.

**Relevant Skills**
We believe Mrs. Parschauer's extensive experience within the aesthetics industry and as an attorney qualifies her to serve on the board of directors.

**Other Public Board Service**
- Arcturus Therapeutics Holdings, Inc. | June 2019-Present [.]

**Defendant Romine**

61.    Defendant Romine served as a Company director from January 2018 until she resigned effective April 15, 2020. She also served as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of March 13, 2020, Defendant Romine beneficially owned 117,326 shares of the Company's common stock, which represented approximately less than 1% of outstanding shares of Company stock as of that date. Given that the price per share of the Company's common stock on March 13, 2020 was $4.96, Defendant Romine owned nearly $581,937 worth of Evolus stock.

62.    For the fiscal year ended December 31, 2019, Defendant Romine received $180,698 in compensation from the Company, which consisted of $45,000 in fees earned or paid in cash and $135,698 in option awards.

63.    The Company's 2020 Proxy Statement stated the following about Defendant Romine:

> **Kristine Romine, M.D.**
> **INDEPENDENT**
> Age: 55
> Evolus Board Service
> - Tenure: 26 months (January 2018)
> - Nominating and Corporate Governance Committee
>
> **Professional Experience**
> Dr. Romine has served as a member of our board of directors since January 2018. From April 2017 to February 2018, Dr. Romine served as a member of Alphaeon's board of directors. In July 2003, Dr. Romine founded and has since served as the Chief Executive Officer of Camelback Dermatology & Skin Surgery in Phoenix, Arizona. Dr. Romine holds a B.S. in Biology from the University of Arizona and an M.D. from the Medical College of Wisconsin.
>
> **Relevant Skills**
> We believe Dr. Romine's extensive experience in the dermatology industry qualifies her to serve on the board of directors.
>
> **Other Public Board Service**

- N/A[.]

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

64.     By reason of their positions as officers and/or directors of Evolus, and because of their ability to control the business and corporate affairs of Evolus, the Individual Defendants owed Evolus and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Evolus in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Evolus and its shareholders so as to benefit all shareholders equally.

65.     Each director and officer of the Company owes to Evolus and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

66.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Evolus, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

67.     To discharge their duties, the officers and directors of Evolus were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

68.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Evolus, the absence of good faith on their

part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

69.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

70.     To discharge their duties, the officers and directors of Evolus were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Evolus were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Evolus' Code of Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Evolus conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Evolus and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Evolus' operations would comply with all applicable laws and Evolus' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

71.     Each of the Individual Defendants further owed to Evolus and the shareholders the duty of loyalty requiring that each favor Evolus' interest and that of its shareholders over their own

while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

72.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Evolus and were at all times acting within the course and scope of such agency.

73.     Because of their advisory, executive, managerial, and directorial positions with Evolus, each of the Individual Defendants had access to adverse, non-public information about the Company.

74.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Evolus.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

75.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

76.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

77.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material

facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Evolus was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

78.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

79.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of Evolus, and was at all times acting within the course and scope of such agency.

## **EVOLUS' CODE OF CONDUCT**

80.     The Company's Code of Conduct states that Evolus "expects each of its directors, officers and employees to read and understand the Code and its application to the performance of his or her business responsibilities. References in the Code to employees are intended to cover officers and, as applicable, directors" and that the Code of Conduct will help define how "directors, officers and employees should conduct themselves as representatives of the Company."

81.     The Code of Conduct further provides that it "reflects the business practices and principles of behavior that support the commitment of Evolus … to maintaining the highest standards of corporate conduct and ethics."

82.     The Code of Conduct further provides that its purpose is to: "(i) promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest; (ii) promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the [SEC] and in other public communications made by the Company; (iii) promote compliance with applicable governmental laws, rules and regulations; (iv) promote the protection of Company assets, including corporate opportunities and confidential information; (v) promote fair dealing practices; (vi) deter wrongdoing; and (vii) ensure accountability for adherence to the Code."

83.     In a section titled, "Honest and Ethical Conduct," the Code of Conduct states the following:

> The Company's policy is to promote high standards of integrity by conducting its affairs in an honest and ethical manner. The integrity and reputation of the Company depends on the honesty, fairness and integrity brought to the job by each person associated with the Company. Each director, officer and employee must act with integrity and observe the highest ethical standards of business conduct in his or her dealings with the Company's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom he or she has contact in the course of performing his or her job.

84.     In a section titled, "Compliance with Laws," the Code of Conduct states the following, in relevant part:

> Acting ethically and obeying the law, both in letter and in spirit, are fundamental principles of the Code. The Company's success depends upon each employee's operating within legal guidelines and cooperating with local, national and international authorities.

85.     In a section titled, "Conflicts of Interest," the Code of Conduct states the following:

> The Company respects the rights of its employees to manage their personal affairs and investments and does not wish to impinge on their personal lives. At the same time, employees should avoid conflicts of interest that occur when their personal interests may interfere in any way with the performance of their duties or the best interests of the Company. A conflicting personal interest could result from an expectation of personal gain now or in the future or from a need to satisfy a prior

or concurrent personal obligation. The Company expects its employees to be free from influences that conflict with the best interests of the Company or might deprive the Company of their undivided loyalty in business dealings. Even the appearance of a conflict of interest where none actually exists can be damaging and should be avoided. Whether or not a conflict of interest exists or will exist can be unclear. Conflicts of interest are prohibited…

86.     In a section titled, "Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting," the Code of Conduct states the following:

The integrity of the Company's records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to the Company's books of account. Therefore, the Company's corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. The Company's records serve as a basis for managing the Company's business and are important in meeting the Company's obligations to customers, suppliers, creditors, employees and others with whom it does business. As a result, it is important that the Company's books, records and accounts accurately and fairly reflect, in reasonable detail, its assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. The Company requires that:

- no entry be made in the Company's books and records that intentionally hides or disguises the nature of any transaction or of any of the Company's liabilities or misclassifies any transactions as to accounts or accounting periods;

\* \* \*

- employees comply with the Company's system of internal controls[.]

87.     The section titled, "Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting," of the Code of Conduct further states the following:

The Company's accounting records are also relied upon to produce reports for its management, stockholders and creditors, as well as for governmental agencies. In particular, the Company relies upon its accounting and other business and corporate records in preparing the periodic and current reports that it is required to file with the SEC. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present the Company's financial condition

and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that the Company's financial disclosure is accurate and transparent and that the Company's reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of the Company's business and finances and the quality and integrity of the Company's accounting and disclosures. In addition:

- no employee may take or authorize any action that would intentionally cause the Company's financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees must cooperate fully with the Company's accounting, finance and legal departments, as well as the Company's independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that the Company's books and records, as well as the Company's reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of the Company's reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of the Company's reports accurate in all material respects.

88.     In a section titled, "Fair Dealing," the Code of Conduct states the following, in

relevant part:

The Company strives to outperform the Company's competition fairly and honestly. Advantages over the Company's competitors are to be obtained through superior performance of the Company's products, not through unethical or illegal business practices. Acquiring proprietary information from others through improper means, possessing trade secret information that was improperly obtained, or inducing improper disclosure of confidential information from past or present employees of other companies is prohibited, even if motivated by an intention to advance the Company's interests. If information is obtained by mistake that may constitute a trade secret or other confidential information of another business, or if you have any questions about the legality of proposed information gathering, you must consult your supervisor or the Compliance Officer, as further described in Sections 15 and 16.

89. In a section titled, "Confidentiality," the Code of Conduct states the following, in relevant part:

> In addition, because the Company interacts with other companies and organizations, there may be times when you learn confidential information about other companies before that information has been made available to the public. You must treat this information in the same manner as you are required to treat the Company's confidential and proprietary information. There may even be times when you at as confidential the fact that the Company has an interest in, or are involved with, another company.

90. In a section titled, "International Business Laws," the Code of Conduct states the following, in relevant part:

> The Company's employees are expected to comply with the applicable laws in all countries to which they travel, in which they operate and where the Company otherwise does business, including laws prohibiting bribery, corruption or the conduct of business with specified individuals, companies or countries. The fact that, in some countries, certain laws are not enforced or that violation of those laws is not subject to public criticism will not be accepted as an excuse for noncompliance. In addition, the Company expects employees to comply with U.S. laws, rules and regulations governing the conduct of business by its citizens and corporations outside the United States.

91. In violation of the Code of Conduct, the Individual Defendants engaged in or permitted the Misappropriation and conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

92.     Evolus is a California-based performance beauty and medical aesthetics company that develops and commercializes products in the self-pay aesthetic market. Evolus touts its first and only product, Jeuveau, as a "proprietary" purified botulinum toxin type A formulation designated for the temporary improvement in the appearance of moderate to severe frown lines in adults. The Company's self-pay aesthetic market primarily includes physicians and other customers who then sell Jeuveau to consumers or use the product while performing aesthetic procedures. Within the self-pay aesthetic market, the global aesthetic neurotoxin market was estimated to generate approximately $2.7 billion of revenue in 2019 and is estimated to grow to approximately $3.9 billion in 2022. The United States aesthetic neurotoxin market was estimated to generate $1.4 billion in sales in 2019 and is expected to grow to approximately $2.0 billion in 2022.

93.     Fundamentally, Evolus intended Jeuveau to be a cost-effective alternative to Allergan's flagship product, Botox, for consumers in the United States. In therapeutic use, small doses of purified botulinum toxin are injected into muscles to block signals from the nerves, i.e. the release of acetylcholine from motor neurons, to the muscles, and, in so doing, inhibiting muscle contraction. The cosmetic form of botulinum toxin is popularly known as Botox, a commonly used injectable to temporarily diminish or remove facial lines and wrinkles, which is manufactured by Allergan and currently distributed by Korean biopharmaceutical company, Medytox.

94.     Evolus was incorporated in the State of Delaware in November 2012. Shortly thereafter, through a series of related transactions in 2013, Evolus' outstanding equity was acquired by Strathspey Crown Holdings Group, LLC (formerly SCH-AEON, LLC) ("SCH"). The following year, SCH contributed Evolus' equity to Alphaeon, making the Company a wholly-owned

subsidiary of Alphaeon prior to its initial public offering which was completed in February 2018. Thereafter, in 2019, Alphaeon transferred its shares in the Company to Alphaeon 1.

95.     In January 2013, Evolus entered into negotiations with Medytox related to a potential supply and license agreement whereby Medytox would sell and supply Meditoxin, a botulinum toxin drug used to treat certain muscular conditions and to remove skin wrinkles, to Evolus for distribution in the United States. Evolus and Medytox exchanged a term sheet and proceeded to negotiate the terms and conditions of the potential agreement. According to the last exchanged term sheet, Medytox was to supply to Evolus Meditoxin at 30% of United States retail price and Evolus would make additional milestone payments throughout the term of the license. On March 19, 2013, the CEOs of the respective companies met in Korea and again in California a few months later, on May 7, 2013. However, thereafter, Evolus suddenly stopped communication with Medytox.

96.     On September 30, 2013, Evolus entered into the Daewoong Agreement with Daewoong, a South Korean pharmaceutical manufacturer. Specifically, under the Daewoong Agreement, in exchange for an initial payment of $2.5 million from the Company, Daewoong agreed to, among other things, manufacture and supply Jeuveau and granted Evolus an exclusive license to import, distribute, promote, market, develop, offer for sale and otherwise commercialize and exploit Jeuveau in, among other places, the United States.

97.     In September 2014, the FDA accepted the Investigational New Drug application, which was submitted by Alphaeon, to conduct clinical trials on Nabota, which was renamed as "Evosyal" for use in the United States market.

98.     Prior to the Daewoong Agreement, Daewoong served as Allergan's exclusive distributor of Botox from 1995 until approximately January 2009. In September 2008, Allergan

informed Daewoong that it was considering terminating its distribution agreement. Therefore, upon such news, Daewoong began searching for a replacement product. In 2010, Daewoong hired Dr. Byung Kook Lee, a former Medytox researcher in Korea from 2004 through 2008 who had access to Medytox's proprietary botulinum toxin strain, to advise Daewoong on the safe management of botulinum toxin strains. Later that same year, Daewoong filed a claim for a new *Clostridium botulinum* toxin type A neurotoxin drug with the Korean Ministry, asserting that it had discovered a strain that it isolated from Korean soil. In November 2013, the Korean Ministry approved the *Clostridium botulinum* toxin type A neurotoxin drug, Nabota. To be sure, the Company's decision to enter the Daewoong Agreement was driven by Daewoong's apparent misappropriation of Allergan's and Medytox's proprietary trade secrets related to Botox.

99.    Thereafter, the Company began hiring former Allergan employees including Defendant Moatazedi, who previously worked in various senior leadership roles at Allergan from March 2005 until May 2018 and most recently as Allergan's Senior Vice President and Head of the United States Medical Aesthetics division during which time he was responsible for Allergan's strategy related to commercializing Botox. Additionally, Evolus hired five other former Allergan employees, including: (1) Defendant Avelar, who worked as Allergan's CMO from March 2011 until December 2013; (2) Defendant Silvernail who worked at Allergan from 1995 until 2003 in various operating and corporate development positions, including Vice President of Business Development; (3) Evolus' Vice President of Corporate Communications, Crystal Muilenburg, who previously worked in various leadership roles, including as Executive Director of International Strategic Marketing, at Allergan from April 2006 until September 2017; (4) Evolus' Vice President of Sales, Kurt Knab, who previously worked as Vice President of United States Hospital Sales at

Allergan in 2017; and (5) Evolus' Chief Marketing Officer, Michael Jafar, who previously worked as Vice President of Marketing, United States Medical Aesthetics at Allergan.

100.     Upon regulatory approval, armed with a management team largely familiar with Evolus' largest competitor's marketing and sales strategy and also with Daewoong, a distributor with insider knowledge of Medytox's proprietary trade secrets relating to the botulinum toxin strain and the manufacturing process of the drug, the Company was set to introduce Jeuveau to the market as a reasonably priced substitute to Botox and deploy a robust sales team to aggressively advertise the product to grab a chunk of the market share.

**The Misappropriation**

101.     During the Relevant Period, the Individual Defendants engaged in and/or permitted the Misappropriation. The Individual Defendants allowed multiple violations of Evolus' corporate governance policies to occur that injured the company. These violations included, but were not limited to, engaging in or allowing the Misappropriation and engaging in or allowing widespread violations of the Company's Code of Conduct. The Misappropriation resulted in a decline in the value of the Company.

**Related Litigation**

***Medytox Action***

102.     On June 7, 2017, Medytox filed a complaint against, Evolus and Daewoong, among other parties, captioned *Medytox Inc. v. Daewoong Pharmaceuticals Co., Ltd.*, No. 30-2017-00924912-CU-IP-CJC (Super. Ct. Orange County) (the "Medytox Action") seeking, *inter alia*, to recover damages resulting from Evolus' misappropriation of certain trade secrets relating to the botulinum toxin strain and the manufacturing process, a declaration that the Daewoong Agreement

is void and unenforceable, and to enjoin Evolus from using the license under the Daewoong Agreement and distributing Jeuveau. Medytox Action, ECF No. 2, ¶¶ 59-70, 99-103.

### ITC Action

103.    On January 30, 2019, Allergan and Medytox filed a complaint against Evolus, captioned *In the Matter of Certain Botulinum Toxin Products,* ITC Inv. No. 337-TA-1145, USITC (the "ITC Action") seeking, *inter alia*, the issuance of an exclusion order forbidding entry of Jeuveau into the United States and a cease and desist order prohibiting Daewoong and Evolus from engaging in the importations, sale for importation, marketing, distribution, offering for sale, the sale after the importation of, or otherwise transferring Jeuveau within the United States and making substantially similar claims regarding the Company's misappropriation of certain trade secrets relating to the botulinum toxin strain and the manufacturing process.

104.    On February 28, 2019, the ITC reached a decision to commence a formal investigation into a potential violation under Section 337 of the Tariff Act of 1930 (the "Tariff Act"). The next day, March 1, 2019, the ITC's investigation began.

105.    Between February 4 and 7, 2020, the ITC conducted a series of evidentiary hearings, which were attended by, among others, Defendant Moatazedi. During the evidentiary hearings, Medytox submitted genetic evidence and expert testimony, verifying that the botulinum toxin strain used by the Company and Daewoong is strikingly akin to that held by Medytox as a trade secret. Medytox contended that the likelihood of the genetic resemblance happening by way of chance was "infinitesimally small – less than one in the number of stars in the universe." Further, the ITC court heard testimony and examined evidence, which supported that Medytox's manufacturing processes was misappropriated by Daewoong, and, in turn, Evolus for the development of Jeuveau and that Daewoong's process was not a consequence of Daewoong's own

clinical research and development. Therefore, the evidentiary record before the ITC court undercut the Company's assertions of Jeuveau's proprietary nature, Daewoong's contentions of proprietary manufacturing process and development, and seriously jeopardized the Company's capacity to lucratively monetize Jeuveau.

106.    Foreseeably, on July 6, 2020, as detailed below, an Administrative Law Judge issued an initial determination finding that the Company violated Section 337 of the Tariff Act by reason of its misappropriation of trade secrets. Shortly thereafter, the Company submitted a petition for review of the initial determination to the ITC and on September 21, 2020, the ITC announced that it would review the Administrative Law Judge's initial determination.

107.    Yet, as described herein, throughout the Relevant Period, the Individual Defendants continuously reassured investors by downplaying the merit of Allergan's and Medytox's allegations in the ITC Action as "speculative" while confirming the Company's confidence in its intellectual property relating to Jeuveau.

**False and Misleading Statements**

***February 1, 2019 Press Release***

108.    On February 1, 2019, the Company issued a press release announcing that the FDA had approved Jeuveau, the Company's sole product. In the press release, Defendant Moatazedi touted the Company's accomplishments and offered forecasts in connection to the launch of Jeuveau. Defendant Moatazedi stated the following, in relevant part:

> Evolus is the first company in nearly a decade to enter the fast-growing U.S. aesthetic neurotoxin market. What makes Evolus unique is our focus on delivering performance beauty products with a customer-centric approach. ***We are pleased to introduce Jeuveau™, the first FDA approved neurotoxin dedicated to aesthetics and manufactured in a state-of-the-art facility using Hi-Pure™ technology***.

\* \* \*

> ***We are focusing our efforts on ensuring a successful launch of Jeuveau™*** and
> have initiated the recruitment of a high-quality, specialized U.S. sales force. The
> launch of Jeuveau™ will be powered by our technology platform designed to
> eliminate the friction points that exist for customers today. Prior to our U.S. launch,
> we expect publication of our U.S. Phase III results and to submit for publication
> our European and Canadian head-to-head Phase III study versus Botox®. I would
> like to thank all the Evolus employees, clinical investigators, patients and our
> partner Daewoong for their diligent efforts in bringing a new option to the market.

(Emphasis added.)

### February 4, 2019 Conference Call

109.     On February 4, 2019, the Company held a conference call in connection with the

FDA's approval of its lead product, Jeuveau. During the call, Defendant Moatazedi, restated

Evolus' goal to quickly market and sell Jeuveau and shared his conviction that the product would

become "#2 in the U.S. market within 24 months of launch," which Defendant Moatazedi intended

to realize by employing a fresh "sales force hired and trained prior to our spring launch." Further,

Defendant Moatazedi reassured investors that the Company could successfully enter that market

against Botox since the Company had "an experienced management team that recognized the traps

for the unwary and knew the challenges faced by other competitors who fell into those traps."

110.     Also during the call, Defendant Avelar emphasized the "proprietary" composition

of Jeuveau, stating that the product was the Company's "proprietary Jeuveau formulation []

manufactured in a brand-new state-of-the-art facility using a Hi-Pure technology."

### March 18, 2019 Earnings Call

111.     On March 18, 2019, the Company held a conference call during which Defendant

Moatazedi underscored the FDA's approval of Jeuveau, stating that "[t]he approval transitioned

Evolus from an R&D-focused company to a commercial-stage organization with our sites now set

on transforming the aesthetic market." Further, Defendant Moatazedi declared that:

2019 is a pivotal year for Evolus and we expect the launch of Jeuveau to transform the aesthetic market as we know it today. In the coming weeks, Jeuveau will enter the largest category in aesthetics. ***There has not been a formidable competitor to challenge the market leader until now. Our plans are complete***. We are well funded and fully prepared to execute on what we believe will be the most exciting launch to engage the aesthetic market.

(Emphasis added.)

112. Defendant Moatazedi maintained that the Company's "commercial strategy" would be successful in launching and implementing Jeuveau into the market, stating that:

> ***The path through successful launch of Jeuveau in this spring is clear. The book is written and now it's only a matter of time before the chapters of the story are unveiled. A number of upcoming catalysts will further enable our success***. In the first half of 2019, we anticipate the publication of our U.S. Phase III trial results and our EU and Canada head-to-head Phase III results versus BOTOX both of which are expected to complement our label and to provide clinically relevant information to our customers. We look forward to presenting the commercial launch plan at our Investor and Analyst Day on May 8th. ***Our team is poised to enter the U.S. markets with a premium brand and high caliber sales force and an impactful commercial strategy***.

(Emphasis added.)

### March 20, 2019 Form 10-K

113. On March 20, 2019, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2018 with the SEC (the "2018 10-K"). The 2018 10-K was signed by Defendants Moatazedi, Silvernail, Malik, Blank, Gill, Hau, Hayman, and Romine, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Moatazedi and Silvernail attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

114.    The 2018 10-K characterized Jeuveau as a "competitive strength," and stated the following, in relevant part:

> *Jeuveau™ will offer the U.S. market the first known 900 kDa neurotoxin alternative to BOTOX.* The manufacture of both Jeuveau™ and BOTOX starts with a 900 kDa complex, includes adding the excipients human serum albumin, or HSA, and sodium chloride, and finishes by vacuum drying. We believe Jeuveau™ is the only known neurotoxin product in the United States with a 900 kDa neurotoxin complex other than BOTOX. *We also believe an important component of competitiveness in the neurotoxin market relates to the characteristics associated with the 900 kDa complex and the potential of the accessory proteins to increase the effectiveness of the active toxin portion of the complex.*

(Emphasis added.)

115.    In the "Risk Factors" section, the 2018 10-K disclosed the following:

> We and our current licensor Daewoong currently rely upon a combination of trademarks, trade secret protection, confidentiality agreements and proprietary know-how.

> \* \* \*

> *Our trade secrets and other confidential proprietary information and those of our licensors could be disclosed or competitors could otherwise gain access to our trade secrets* or independently develop substantially equivalent information and techniques. Further, the laws of some foreign countries do not protect proprietary rights to the same extent or in the same manner as the laws of the United States. *As a result, we or any of our current or future licensors may encounter significant problems in protecting and defending our or their intellectual property both in the United States and internationally.* If we or any of our current or future licensors are unable to prevent material disclosure of the non-patented intellectual property related to Jeuveau™ to third parties, we may not be able to establish or maintain a competitive advantage in our market, which could adversely affect our business.

(Emphasis added.)

116.    The 2018 10-K stated, in relevant part, about the Company's disclosure controls and procedures:

> Our management, under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer, our principal executive and principal financial officers, respectively, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures,

as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act of 1934, as amended, as of the end of the period covered by this Annual Report on Form 10-K. ***Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures were effective (a) to ensure that information that we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and (b) to include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in reports filed or submitted under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure***.

(Emphasis added.)

117.   The 2018 10-K stated, in relevant part, about the Company's internal control over financial reporting:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) under the Exchange Act. Under the supervision and with the participation of senior management, including our Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of our internal control over financial reporting based on the framework in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). ***Based on the evaluation under that framework and applicable SEC rules, our management concluded that our internal control over financial reporting was effective as of December 31, 2018***.

\* \* \*

There were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the quarter ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

### April 26, 2019 Press Release

118.   On April 26, 2019, the Company issued a press release announcing that the European Medicines Agency's ("EMA") Committee for Medical Products for Human Use

("CHMP") had "issued a positive opinion on the Nuceiva[1] marketing authorization application." In the press release, Defendant Moatazedi stated that the CHMP's "*positive opinion further validates the rigor of our TRANSPARENCY clinical development program, which includes the largest aesthetics head-to-head pivotal study versus BOTOX*." (Emphasis added.)

### April 29, 2019 Proxy Statement

119. On April 29, 2019, the Company filed a Schedule 14A with the SEC (the "2019 Proxy Statement"). Defendants Moatazedi, Malik, Blank, Gill, Hau, Hayman, and Romine solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[2]

120. The 2019 Proxy Statement was false and misleading because, despite noting that the Company maintains a "Code of Conduct applicable to all directors, officers and employees of Evolus and its subsidiaries," the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

121. The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the genuine origin of botulinum toxin bacterial strain and the manufacturing process employed to create Jeuveau were misappropriated from Medytox; (2) ample evidence was submitted on record in the ITC Action to support a finding that the Company misappropriated certain trade secrets relating to the botulinum toxin strain and the manufacturing process for the invention of Jeuveau; (3)

---

[1] Nuceiva is branded as Jeuveau in the United States.
[2] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

consequently, there was a serious risk that Evolus would be subject to regulatory and/or court action, banning the import, marketing, and sale of Jeuveau and that the Company's ability to monetize Jeuveau in the United States would be significantly impaired as a result; (4) all proceeds produced from the commercialization of Jeuveau were the consequence of the Company's misappropriation of certain of Allergan's and Medytox's trade secrets relating to the botulinum toxin strain and the manufacturing process; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *April 30, 2019 Conference Call*

122.     On April 30, 2019, Evolus held a conference call in connection to the Company's financial results for the fiscal quarter ended March 31, 2019. During the call, Defendant Moatazedi highlighted Evolus' readiness to fully implement its commercial approach to launch Jeuveau into the market, stating the following, in relevant part:

> During the quarter, we also announced the publication of our Phase III U.S. pivotal trial in dermatologic surgery, which further validated the safety and efficacy of Jeuveau versus placebo. We have now fully hired our U.S. sales force. We screened over 6,000 candidates and, following an extensive interview process, we deployed a 140-person sales force. We are pleased with the composition of our sales team. 80% have aesthetic experience. It is clear we have one of the most experienced and, now following our national sales meeting, one of the most energized sales teams in the field. With our singularity and focus, ***the sales team is now fully prepared to execute our launch in the coming days.***
>
> * * *
>
> We are within days of introducing the first 900-kilodalton neurotoxin in the United States in nearly 30 years. ***The path to achieving our goal of the #2 market share position within 24 months of launch is clear.***

(Emphasis added.)

*May 1, 2019 Form 10-Q*

123.    On May 1, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal

quarter ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendants

Moatazedi and Silvernail, and contained SOX certifications signed by Defendants Moatazedi and

Silvernail attesting to the accuracy of the financial statements contained therein, the disclosure of

any material changes to the Company's internal controls, and the disclosure of any fraud

committed by the Company, its officers, or its directors.

124.    The 1Q19 10-Q repeated the "proprietary" character of Evolus' sole product and

the continued to emphasize the FDA's approval thereof, supposedly grounded in scientific

development:

> *Jeuveau™ is a proprietary 900 kDa purified botulinum toxin type A formulation indicated for the temporary improvement in the appearance of moderate to severe glabellar lines, also known as "frown lines," in adults.* We believe we will offer physicians and consumers a compelling value proposition with Jeuveau™. Currently, onabotulinumtoxinA (BOTOX) is the neurotoxin market leader, and prior to the approval of Jeuveau™, was the only known 900 kDa botulinum toxin type A complex approved in the United States. *We believe aesthetic physicians generally prefer the performance characteristics of the complete 900 kDa neurotoxin complex and are accustomed to injecting this formulation.*

(Emphasis added.)

125.    The 1Q19 10-Q also stated that the Company planned on "building [its]

commercialization infrastructure, including marketing, sales and distribution functions, inventory

build prior to commercial launch, initiating a product experience program for Jeuveau™ and

training and deploying a specialty sales force and implementing a targeted marketing campaign."

126.    The 1Q19 10-Q stated, in relevant part, about the Company's disclosure controls

and procedures:

> As of March 31, 2019, our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, who serve as our principal

executive officer and principal financial officer, respectively, performed an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act. Our disclosure controls and procedures are designed to ensure (a) that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (b) that information required to be disclosed by us in reports filed or submitted under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and our Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures. ***Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that, as of March 31, 2019, our disclosure controls and procedures were effective at a reasonable assurance level***.

(Emphasis added.)

127. The 1Q19 10-Q stated, in relevant part, about the Company's internal control over financial reporting:

There were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the quarter ended March 31, 2019 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

***August 12, 2019 Form 10-Q & Earnings Call***

128. On August 12, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendants Moatazedi and Silvernail, and contained SOX certifications signed by Defendants Moatazedi and Silvernail attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

129. Like the 1Q19 10-Q, the 2Q19 10-Q repeated the "proprietary" character of Jeuveau and emphasized the FDA's approval thereof which was purportedly based upon scientific development:

*Jeuveau® is a proprietary 900 kDa purified botulinum toxin type A formulation indicated for the temporary improvement in the appearance of moderate to severe glabellar lines, also known as "frown lines," in adults*. Our primary market is the self-pay aesthetic market, which includes medical products purchased by physicians that are then sold to consumers or used in procedures for aesthetic indications that are not reimbursed by any third-party payor, such as Medicaid, Medicare or commercial insurance. *We believe we offer physicians and consumers a compelling value proposition with Jeuveau®. Currently, onabotulinumtoxinA (BOTOX) is the neurotoxin market leader, and prior to the approval of Jeuveau®, was the only known 900 kDa botulinum toxin type A complex approved in the United States*. We believe aesthetic physicians generally prefer the performance characteristics of the complete 900 kDa neurotoxin complex and are accustomed to injecting this formulation.

(Emphasis added.)

130.    Further, the Company's 2Q19 10-Q reported "net revenues of $2.3 million consisting of sales of Jeuveau® which was commercially launched and began shipping to customers in the United States in May 2019[]" and stated that the Company planned on "building [its] commercialization infrastructure, including marketing, sales and distribution functions, inventory build prior to commercial launch, initiating a product experience program for Jeuveau™ and training and deploying a specialty sales force and implementing a targeted marketing campaign."

131.    The 2Q19 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

As of June 30, 2019, our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, who serve as our principal executive officer and principal financial officer, respectively, performed an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act. Our disclosure controls and procedures are designed to ensure (a) that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (b) that information required to be disclosed by us in reports filed or submitted under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and our Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures.

> ***Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that, as of June 30, 2019, our disclosure controls and procedures were effective at a reasonable assurance level***.

(Emphasis added.)

132.   The 2Q19 10-Q stated, in relevant part, about the Company's internal control over financial reporting:

> There were no other changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the quarter ended June 30, 2019 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

133.   Also on August 12, 2019, the Company held an earnings call in connection to Evolus' financial results for the fiscal quarter ended June 30, 2019. During the call, Defendant Moatazedi flaunted Evolus' quarterly revenue and marketing scheme, stating, in relevant part:

> We reported $2.3 million of Q2 net revenue, which came from early adopters and accounts that completed the jet program. We expect customer shipments to shift from jet units to revenue generating units as we progress through the third quarter and into Q4. As such you can expect 2019 revenue to be back loaded towards the fourth quarter.

134.   Also on the call, Defendant Silvernail touted the same achievements, stating:

> And during the second quarter we booked net revenue from Jeuveau of $2.3 million. We recognize revenue upon delivery to customers and we deferred no revenue to future periods. For the second quarter ended June 30, gross margin was 71.4%. Please note we expect our gross margin percentage to fluctuate on a quarterly basis as we implement various marketing programs that may affect the average selling price of Jeuveau.

135.   In response to a question from Wells Fargo analyst, David Maris, regarding the "Korean Situation,"[3] Defendant Moatazedi replied that he and Evolus "continue to remain confident in [the Company's] IP."

---

[3] Mr. Maris was referring to the ITC Action and the allegations therein.

136.    When asked by Barclays analyst, Balji Prasad, about Allergan having to turn over the Botox manufacturing secrets, Defendant Moatazedi replied, "[a]s we said from the beginning, we remain very confident in our IP and we'll let the court system continue to work through the case."

***November 4, 2019 Press Release, Form 10-Q & Earnings Call***

137.    On November 4, 2019, the Company issued a press release announcing its financial results for the third fiscal quarter ended September 30, 2019. In the press release, Defendant Moatazedi trumpeted Evolus' quarterly revenue as "exceptional" and emphasized "steady increase of new accounts month-over-month."

138.    Also on November 4, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2019 (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Defendants Moatazedi and Silvernail, and contained SOX certifications signed by Defendants Moatazedi and Silvernail attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

139.    Like the 1Q19 10-Q and the 2Q19 10-Q, the 3Q19 10-Q reiterated the "proprietary" nature of Evolus' lead product, supposedly grounded in scientific development, and emphasized the FDA's approval thereof:

> ***Jeuveau® is a proprietary 900 kDa purified botulinum toxin type A formulation indicated for the temporary improvement in the appearance of moderate to severe glabellar lines, also known as "frown lines," in adults***. Our primary market is the self-pay aesthetic market, which includes medical products purchased by physicians that are then sold to consumers or used in procedures for aesthetic indications that are not reimbursed by any third-party payor, such as Medicaid, Medicare or commercial insurance. ***We believe we offer physicians and consumers a compelling value proposition with Jeuveau®. Currently, onabotulinumtoxinA (BOTOX) is the neurotoxin market leader, and prior to the approval of Jeuveau®, was the only known 900 kDa botulinum toxin type A complex approved in the***

*United States*. We believe aesthetic physicians generally prefer the performance characteristics of the complete 900 kDa neurotoxin complex and are accustomed to injecting this formulation.

(Emphasis added.)

140.    Further, the Company's 3Q19 10-Q reported "recorded net revenues of $13.2 million and $15.5 million for the three and nine months ended September 30, 2019, respectively."

141.    The 3Q19 10-Q stated, in relevant part, about the Company's disclosure controls and procedures:

> As of September 30, 2019, our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, who serve as our principal executive officer and principal financial officer, respectively, performed an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act. Our disclosure controls and procedures are designed to ensure (a) that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (b) that information required to be disclosed by us in reports filed or submitted under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and our Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures. ***Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that, as of September 30, 2019, our disclosure controls and procedures were effective at a reasonable assurance level***.

(Emphasis added.)

142.    The 3Q19 10-Q stated, in relevant part, about the Company's internal control over financial reporting:

> During the three months ended September 30, 2019, there were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred with respect to the quarter ended September 30, 2019 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

143.    Also on November 4, 2019, the Company held an earnings call in connection to Evolus' financial results for the fiscal quarter ended September 30, 2019. During the call, Defendant Moatazedi publicized Evolus' quarterly revenue and its rising status in the United States neurotoxin industry, stating, in relevant part:

> *We do have a lot of confidence in the base of accounts that placed an order in the third quarter and we feel that base is a sustainable one moving forward*. And as you read in the press release, we talked a bit about the continued increase, a steady increase of new accounts placing orders that we observed throughout the third quarter.
>
> * * *
>
> As it relates to how close are we to number two, look we outlined this as a two-year endeavor, and we're now just finishing our first full quarter. We want to make sure that we don't get too far ahead of ourselves. *We feel good that we're on a trajectory to get to that number two position, but we still feel that two-year time frame is the right time frame to be thinking about this launch*.

(Emphasis added.)

### February 25, 2020 Press Release, Form 10-K & Earnings Call

144.    On February 25, 2020, the Company issued a press release announcing its financial results for the fiscal quarter and full year ended December 31, 2019. In the press release, Defendant Moatazedi plugged Evolus' results, stating:

> *We positioned Evolus for long-term success starting with the first aesthetic only neurotoxin business model in the United States. Our competitive advantage is driven by a singularity of focus on the largest market in aesthetics combined with our proprietary digital platform and a consumer strategy designed for the fast-growing millennial segment*." [] "2019 was a very successful year for Evolus, marked by the rapid uptake of Jeuveau®, which achieved the number three unit share position. *We believe we are well on our way to achieving the number two unit share position within 24 months of launch*.

(Emphasis added.)

145.    Also on February 25, 2020, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K was signed by

Defendants Moatazedi, Silvernail, Malik, Blank, Farrell, Gill, Hau, Hayman, Parschauer, and Romine, and contained SOX certifications signed by Defendants Moatazedi and Silvernail attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

146.    Like the quarterly and annual reports previously filed, as described above, the 2019 10-K reiterated the "proprietary" nature of Jeuveau and emphasized the FDA's approval thereof, which was supposedly founded in scientific development:

> *Jeuveau® is a proprietary 900 kDa purified botulinum toxin type A formulation indicated for the temporary improvement in the appearance of moderate to severe glabellar lines, also known as "frown lines," in adults*. Our primary market is the self-pay aesthetic market, which includes medical products purchased by physicians that are then sold to consumers or used in procedures for aesthetic indications that are not reimbursed by any third-party payor, such as Medicaid, Medicare or commercial insurance. *We believe we offer physicians and consumers a compelling value proposition with Jeuveau®. Currently, onabotulinumtoxinA (BOTOX) is the neurotoxin market leader, and prior to the approval of Jeuveau®, was the only known 900 kDa botulinum toxin type A complex approved in the United States*. We believe aesthetic physicians generally prefer the performance characteristics of the complete 900 kDa neurotoxin complex and are accustomed to injecting this formulation.

(Emphasis added.)

147.    The 2019 10-K also stated the following regarding the "key components" of the Company's strategy in continuing to commercialize its lead product, Jeuveau:

- Partner outside of the United States to reach and serve physicians and consumers in those territories.
- Pursue an aesthetic-only strategy to enhance marketing and pricing flexibility along with improving transparency for our customers.
- Leverage our strong KOL relationships to assist in scientific presentations, publications, and other methods to drive success of our commercial launch of Jeuveau®.
- Leverage our differentiated digital platform to efficiently open new accounts, personalize the purchasing process and efficiently deploy marketing programs at scale.

148. In the "Risk Factors" section, the 2019 10-K disclosed the following:

We and our current licensor, Daewoong, currently rely upon a combination of trademarks, trade secret protection, confidentiality agreements and proprietary know-how. Botulinum toxin cannot be patented, as it is produced by *Clostridium botulinum*, a gram-positive, rod-shaped, anaerobic, spore-forming, motile bacterium with the ability to produce the neurotoxin botulinum. ***Only the manufacturing process for botulinum toxin can be patented, for which Daewoong has obtained a U.S. patent. Our trade secrets and other confidential proprietary information and those of our licensors could be disclosed or competitors could otherwise gain access to our trade secrets or independently develop substantially equivalent information and techniques***. Further, the laws of some foreign countries do not protect proprietary rights to the same extent or in the same manner as the laws of the United States. As a result, we or any of our current or future licensors may encounter significant problems in protecting and defending our or their intellectual property both in the United States and internationally. If we or any of our current or future licensors are unable to prevent material disclosure of the non-patented intellectual property related to Jeuveau® to third parties, we may not be able to establish or maintain a competitive advantage in our market, which could adversely affect our business.

(Emphasis added.)

149. The 2019 10-K stated, in relevant part, about the Company's disclosure controls and procedures:

Our management, under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer, our principal executive and principal financial officers, respectively, conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act of 1934, as amended, as of the end of the period covered by this Annual Report on Form 10-K. ***Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures were effective (a) to ensure that information that we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and (b) to include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in reports filed or submitted under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure***.

(Emphasis added.)

150.    The 2019 10-K stated, in relevant part, about the Company's internal control over

financial reporting:

Our management is responsible for establishing and maintaining adequate internal
control over financial reporting, as such term is defined in Rule 13a-15(f) under the
Exchange Act. Under the supervision and with the participation of senior
management, including our Chief Executive Officer and Chief Financial Officer,
we evaluated the effectiveness of our internal control over financial reporting based
on the framework in *Internal Control-Integrated Framework* issued by the
Committee of Sponsoring Organizations of the Treadway Commission (2013
framework). ***Based on the evaluation under that framework and applicable SEC
rules, our management concluded that our internal control over financial
reporting was effective as of December 31, 2019***.

\* \* \*

There were no changes in our internal control over financial reporting identified in
connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the
Exchange Act that occurred during the quarter ended December 31, 2019 that have
materially affected, or are reasonably likely to materially affect, our internal control
over financial reporting.

(Emphasis added.)

151.    Also on February 25, 2020, the Company held an earnings call in connection to

Evolus' financial results for the fiscal quarter and full year ended December 31, 2019. During the

call, Defendant Moatazedi stated, in relevant part, the following:

2019 was a very successful year for Evolus, marked by the rapid uptake of Jeuveau
in the US. During the year, we achieved the number three unit share position. We
increased our purchasing account base from approximately 350 in the second
quarter to 2,000 in the third quarter, and finished the year with over 3,500
purchasing accounts. And lastly, we drove net revenue from $13.2 million in the
third quarter to $19.5 million in the fourth.
In 2019, all key performance indicators trended up and to the right. We established
a strong account base, which grew at a steady rate. Reorder rates continued to rise,
and we are pleased to report patient satisfaction after day 150 exceeded 75%, based
on our J.E.T. survey. In 2020, we transitioned to the second phase of our launch,
which is focused on building Jeuveau into a consumer brand.

\* \* \*

...***Evolus is well-positioned for long-term success***. We have a singularity in focus with one product in a large $1.4 billion aesthetic market. Our investments are hyper-targeted on the female millennial segment, which is over-indexing on growth versus the broader market. And our proprietary digital platform enables account personalization at scale.

\* \* \*

Lastly, I'd like to provide an update on the International Trade Commission, or ITC case. As you may know, the ITC hearings took place February 4 through 7 in Washington D.C. In June, the judge will reach an initial determination, followed by a final decision by the ITC targeted for October 2020. In the interim, it's customary for various redacted versions of motions, briefs and transcripts to become public. However, I would caution you not to draw any definite conclusions from individual documents, as the initial determination will be decided based on the totality of the merits as assessed by the judge in June and the ITC in October. We look forward to resolving the case before year end and remain confident in the strength of our IP. We can't speak further to this matter on today's call, but recognize it is something important to all of our employees and to our shareholders.

(Emphasis added.)

152.     In response to a question regarding "potential realistic scenarios that could emerge from [the ITC Action], from the worst case to the best case," Defendant Moatazedi stated:

***Clearly, top of mind for investors***. As we mentioned earlier, the hearings took place earlier in February. And with the ITC, the majority of those hearings are confidential. It's not like a public trial where most of the information is available to you. So unfortunately, Annabel, I'm not able to provide any more color than what I provided earlier. ***That being said, nothing changed through the case. We feel confident in the strength of our IP and we expect that this case will be resolved before the end of the year and this will be behind us***.

(Emphasis added.)

153.     Further, Defendant Moatazedi painted a promising forecast for the Company's future sales revenue, stating that the:

[N]ext wave of customers, whether you think about our growth coming from going wider from 3,500 customers up, which we expect to do in 2020 or deeper in terms of the utilization per customer will come off of the backs of both the Evolux and the consumer loyalty program.

53

154.    Also on the call, Defendant Silvernail accentuated Evolus' quarterly revenue growth, stating:

> During the fourth quarter, net revenue was $19.5 million, which was 48% increase over Q3 2019. Q4 net revenue consisted of $18.8 million of Jeuveau product sales in the US and $700,000 of revenue from sales to our Canadian partner. Our full-year net revenue was $34.9 million. As David discussed, we are pleased by the quality of the revenue and the growth trajectory in 2019. In the fourth quarter, gross margin increased to 81% compared to 72% in Q3 of 2019. Gross margin in Q4 increased due to one-time launch pricing from our manufacturing partner.

### The Truth Begins to Emerge as False and Misleading Statements Continue

#### March 4, 2020 Press Release

155.    On or about March 4, 2020, Medytox announced that a staff attorney at the ITC submitted an opinion supporting Medytox's claim that Daewoong and Evolus used Medytox's botulinum toxin strain. Additionally, Medytox remarked that "ITC attorneys' opinions are known to have a profound effect on the final decision of the court."

156.    In response, the Company issued a press release on that same day characterizing Medytox's statements as "speculative and intended to create confusion in the U.S. market ahead of the ITC Judge's initial determination in June 2020 and the ITC's final determination, which is targeted for October 2020." Further, the Company noted that "it's fairly common for the Judge and the staff attorney to disagree on substantive matters." Moreover, the press release stated that "Evolus and Daewoong remain confident in the strength of our intellectual property…"

157.    On this news, the price of the Company's stock dropped from $7.43 per share at the close of trading on March 4, 2020, to $7.01 per share at the close of trading on March 5, 2020, representing a decrease of about 5.7%, on heavy trading volume.

*March 17, 2020 Proxy Statement*

158.    On March 17, 2020, the Company filed the 2020 Proxy Statement with the SEC. Defendants Moatazedi, Malik, Blank, Farrell, Gill, Hau, Hayman, Parschauer, and Romine solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[4]

159.    The 2020 Proxy Statement was false and misleading because, despite noting that the Company maintains a "Code of Conduct applicable to all directors, officers and employees of Evolus and its subsidiaries," the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

160.    The 2020 Proxy Statement also failed to disclose, *inter alia*, that: (1) the genuine origin of botulinum toxin bacterial strain and the manufacturing process employed to create Jeuveau were misappropriated from Medytox; (2) ample evidence was submitted on record in the ITC Action to support a finding that the Company misappropriated certain trade secrets relating to the botulinum toxin strain and the manufacturing process for the invention of Jeuveau; (3) consequently, there was a serious risk that Evolus would be subject to regulatory and/or court action, banning the import, marketing, and sale of Jeuveau and that the Company's ability to monetize Jeuveau in the United States would be significantly impaired as a result; (4) all proceeds produced from the commercialization of Jeuveau were the consequence of the Company's misappropriation of certain of Allergan's and Medytox's trade secrets relating to the botulinum

---

[4] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

toxin strain and the manufacturing process; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### May 11, 2020 Form 10-Q

161.    On May 11, 2020, the Company issued a press release announcing its financial results for the first fiscal quarter ended March 31, 2020. In the press release, Defendant Moatazedi stated that "[o]ur efficient business model and innovative customer and consumer programs designed for the millennial segment are expected to drive continued share penetration." The press release touted "[s]trong underlying market demand for Jeuveau® in the first quarter of 2020 as shown by a greater than 15% increase in purchasing accounts to over 4,100 accounts[3] and healthy re-order rates of 62%" as a "Key 2020 Business Highlight." Moreover, the Company stated that after the second fiscal quarter of 2020, "Evolus expects … sequential quarterly improvement in U.S. net revenues for the balance of 2020."

162.    Also on May 11, 2020, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2020 (the "1Q20 10-Q"). The 1Q20 10-Q was signed by Defendants Moatazedi and Silvernail, and contained SOX certifications signed by Defendants Moatazedi and Silvernail attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

163.    Like the previously filed Form 10-Qs and Form 10-Ks described above, the 1Q20 10-Q continued to describe the "proprietary" nature of Evolus' lead product and emphasized the FDA's approval thereof supposedly grounded in scientific development:

> *Jeuveau® is a proprietary 900 kDa purified botulinum toxin type A formulation indicated for the temporary improvement in the appearance of moderate to severe*

*glabellar lines, also known as "frown lines," in adults.* Our primary market is the self-pay aesthetic market, which includes medical products purchased by physicians and other customers that are then sold to consumers or used in procedures for aesthetic indications that are not reimbursed by any third-party payor, such as Medicaid, Medicare or commercial insurance. *We believe we offer customers and consumers a compelling value proposition with Jeuveau®. Currently, onabotulinumtoxinA (BOTOX) is the neurotoxin market leader, and prior to the approval of Jeuveau®, was the only known 900 kDa botulinum toxin type A complex approved in the United States.* We believe aesthetic physicians generally prefer the performance characteristics of the complete 900 kDa neurotoxin complex and are accustomed to injecting this formulation.

(Emphasis added.)

164.    The 1Q20 10-Q stated, in relevant part, about the Company's disclosure controls

and procedures:

> As of March 31, 2020, our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, who serve as our principal executive officer and principal financial officer, respectively, performed an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act. Our disclosure controls and procedures are designed to ensure (a) that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (b) that information required to be disclosed by us in reports filed or submitted under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and our Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures. *Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that, as of March 31, 2020, our disclosure controls and procedures were effective at a reasonable assurance level.*

(Emphasis added.)

165.    The 1Q20 10-Q stated, in relevant part, about the Company's internal control over

financial reporting:

> During the three months ended March 31, 2020, there were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred with respect to the quarter ended March 31, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

166.    Also on May 11, 2020, the Company held an earnings call in connection to Evolus'

financial results for the fiscal quarter ended March 31, 2020. During the call, Defendant Moatazedi

stated that Evolus "remain[s] confident in the strength of [its] IP."

167.    The statements referenced in ¶¶ 108–118, 122–157, and 161–166, herein were

materially false and misleading and failed to disclose material facts necessary to make the

statements made not false and misleading. Specifically, the Individual Defendants failed to

disclose, *inter alia*, that: (1) the genuine origin of botulinum toxin bacterial strain and the

manufacturing process employed to create Jeuveau were misappropriated from Medytox; (2)

ample evidence was submitted on record in the ITC Action to support a finding that the Company

misappropriated certain trade secrets relating to the botulinum toxin strain and the manufacturing

process for the invention of Jeuveau; (3) consequently, there was a serious risk that Evolus would

be subject to regulatory and/or court action, banning the import, marketing, and sale of Jeuveau

and that the Company's ability to monetize Jeuveau in the United States would be significantly

impaired as a result; (4) all proceeds produced from the commercialization of Jeuveau were the

consequence of the Company's misappropriation of certain of Allergan's and Medytox's trade

secrets relating to the botulinum toxin strain and the manufacturing process; and (5) the Company

failed to maintain internal controls. As a result of the foregoing, the Company's public statements

were materially false and misleading at all relevant times.

**The Truth Fully Emerges**

168.    On July 6, 2020, the ITC court issued its initial determination regarding whether

the Company violated Section 337 of the Tariff Act by misappropriating trade secrets from

Medytox. The ITC court's initial determination held that Daewoong did, in fact, misappropriate

Medytox's trade secrets related to the manufacturing process of the botulinum toxin strain and

used it to develop Jeuveau and, together with the Company, to import Jeuveau into the United States. Further, the ITC court held that the foregoing misappropriation had caused a substantial injury to the industry within the United States. Consequently, the ITC court recommended a limited ban precluding the Company from importing Jeuveau into the United States for ten years and a cease and desist order enjoining Evolus from marketing and selling Jeuveau in the United States also for a period of ten years.

169.     On this news, the price of the Company's stock plunged from $5.32 per share at the close of trading on July 6, 2020, to $3.35 per share at the close of trading on July 8, 2020, representing a loss in value of over 37%, on heavy trading volume.

170.     Subsequently, on August 6, 2020, the ITC court released its 282-page initial determination to the public which disclosed the large breadth of evidence that had mounted against Evolus throughout the ITC Action.

## DAMAGES TO EVOLUS

171.     As a direct and proximate result of the Individual Defendants' conduct, Evolus will lose and expend many millions of dollars.

172.     Such expenditures include, but are not limited to, legal fees associated with the Medytox Action and the ITC Action filed against the Company, among others, and the Securities Class Action filed against the Company, its President and CEO, its CMO, and its CFO and Executive Vice President, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

173.     Such expenditures include, but are not limited to costs associated with the costs of defending investigations of the Misappropriation and for fines paid in connection thereto.

174.     These expenditures also include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

175.    As a direct and proximate result of the Individual Defendants' conduct, Evolus has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

176.    Plaintiff brings this action derivatively and for the benefit of Evolus to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Evolus, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

177.    Evolus is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

178.    Plaintiff is, and has been at all relevant times, a shareholder of Evolus. Plaintiff will adequately and fairly represent the interests of Evolus in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

179.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

180.    A pre-suit demand on the Board of Evolus is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Moatazedi, Malik, Blank, Gill, Hayman, Farrell and Parschauer (the "Directors"). Plaintiff needs

only to allege demand futility as to four of the seven Directors who are on the Board at the time this action is commenced.

181.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material facts while certain of the Individual Defendants engaged in insider sales based on material non-public information, all of which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

182.    Demand is also excused as to all of the Directors because the Misappropriation was an unlawful business strategy that the Company engaged in and was not a valid exercise of business judgment, as it was based on bad faith and intentional, reckless, or disloyal misconduct. As the ultimate decision-making body of the Company, the Board made and/or allowed the Company to engage in the schemes outlined herein.

183.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

184.    Demand is also excused as to the Directors because they were fully aware of the Misappropriation during the Relevant Period. Nonetheless, the Directors caused the Company to

disseminate the false and misleading statements described herein. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

185.   Additional reasons that demand on Defendant Moatazedi is futile follow. Defendant Moatazedi has served as the Company's President and CEO since May 2018. Thus, as the Company recognizes, he is a non-independent director. The Company provides Defendant Moatazedi with his principal occupation, and he receives handsome compensation, including $2,278,813 in 2019 for his services. Defendant Moatazedi was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings and press releases referenced herein which he signed off on and/or signed SOX certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Misappropriation (which Defendant Moatazedi engaged in and permitted despite being aware of it), the Company's scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Moatazedi is a defendant in the Securities Class Action. For these reasons, Defendant Moatazedi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

186.   Additional reasons that demand on Defendant Malik is futile follow. Defendant Malik has served as a Company director and Chairman of the Board since January 2018. He is also affiliated with Evolus' former controller, Alphaeon. Thus, as the Company recognizes, he is a non-independent director. Defendant Malik has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any,

oversight of the Misappropriation (which Defendant Malik engaged in and permitted despite being aware of it), the Company's scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Malik signed, and thus personally made the false and misleading statements in the 2018 and 2019 10-Ks. For these reasons, Defendant Malik breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

187.    Additional reasons that demand on Defendant Blank is futile follow. Defendant Blank has served as a Company director since January 2018. She also served as Chairwoman of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee until she resigned from those committee positions effective June 30, 2019. Defendant Blank is also affiliated with Alphaeon and has served on its board of managers since January 2020. As the Company recognizes, she is a non-independent director. Defendant Blank has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the Misappropriation (which Defendant Blank engaged in and permitted despite being aware of it), the Company's scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Blank signed, and thus personally made the false and misleading statements in the 2018 and 2019 10-Ks. For these reasons, Defendant Blank breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

188.     Additional reasons that demand on Defendant Farrell is futile follow. Defendant Farrell has served as a Company director since July 2019. He also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Farrell has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Misappropriation (which Defendant Farrell engaged in and permitted despite being aware of it), the Company's scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Farrell signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons, Defendant Farrell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

189.     Additional reasons that demand on Defendant Gill is futile follow. Defendant Gill has served as a Company director since February 2018. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee. Defendant Gill has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Misappropriation (which Defendant Gill engaged in and permitted despite being aware of it), the Company's scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Gill signed, and thus personally made the false and misleading statements in the 2018 and 2019 10-Ks. For these reasons, Defendant Gill breached

his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon his is futile and, therefore, excused.

190.   Additional reasons that demand on Defendant Hayman is futile follow. Defendant Hayman has served as a Company director since January 2018. He also serves as the Chair of the Company's Compensation Committee. Defendant Hayman has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Misappropriation (which Defendant Hayman engaged in and permitted despite being aware of it), the Company's scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Hayman signed, and thus personally made the false and misleading statements in the 2018 and 2019 10-Ks. For these reasons, Defendant Hayman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

191.   Additional reasons that demand on Defendant Parschauer is futile follow. Defendant Parschauer has served as a Company director since July 2019. She also serves as the Chair of the Nominating and Corporate Governance Committee, as a member of the Audit Committee, and as a member of the Compensation Committee. Defendant Parschauer has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the Misappropriation (which Defendant Parschauer engaged in and permitted despite being aware of it), the Company's scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded

her duties to protect corporate assets. Furthermore, Defendant Parschauer signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons, Defendant Parschauer breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

192.   Additional reasons that demand on the Board is futile follow.

193.   Defendants Farrell, Gill, Hayman, and Parschauer (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the Company's financial reporting process, the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, and the Company's internal controls over financial reporting. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

194.   The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Moatazedi and Avelar both served in senior roles at Allergan between March 2011 and December 2013, including as Senior Director of Marketing, US Plastic Surgery and as CMO, respectively. Additionally, Defendants Malik, Blank, Hayman, and Romine have all served as a member of Alphaeon's board of directors together while Defendant Avelar served as CMO of Alphaeon from January 2014 to February 2018. Specifically, Defendant Malik has served as a member of Alphaeon's board of

directors since April 2014 and Defendant Blank has served as a member of Alphaeon's board of directors since July 2016. Defendant Hayman also served on Alphaeon's board of directors from April 2014 to February 2018 and Defendant Romine served on Alphaeon's board of directors from April 2017 to February 2018. Moreover, Defendants Malik and Blank have served together as members on the board of managers of Alphaeon 1 since January 2020. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.

195. In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's involvement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

196. Evolus has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Evolus any part of the damages Evolus suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

197. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation

from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

198.    The acts complained of herein constitute violations of fiduciary duties owed by Evolus' officers and directors, and these acts are incapable of ratification.

199.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Evolus. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Evolus, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

200.    If there is no directors' and officers' liability insurance, then the Directors will not cause Evolus to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

201.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of Section 14(a) of the Exchange Act

202.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

203.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

204.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

205.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

206.    Under the direction and watch of the Directors, the 2019 and 2020 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) the genuine origin of botulinum toxin bacterial strain and the manufacturing process employed to create Jeuveau were misappropriated from Medytox; (2) ample evidence was submitted on record in the ITC Action to support a finding that the Company misappropriated certain trade secrets relating to the botulinum toxin strain and the manufacturing process for the invention of Jeuveau; (3) consequently, there was a serious risk that Evolus would be subject to regulatory and/or court action, banning the import, marketing, and sale of Jeuveau and that the Company's ability to monetize Jeuveau in the United States would be significantly impaired as a result; (4) all proceeds produced from the commercialization of Jeuveau were the consequence of the Company's misappropriation of certain of Allergan's and Medytox's trade secrets relating to the botulinum toxin strain and the manufacturing process; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

207.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were based on the Misappropriation and misrepresented as a result of false and misleading statements,

causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

208.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their engagement in or the tolerance of the Misappropriation and the scheme to issue false and misleading statements and omissions of material fact.

209.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to the Board's risk oversight, which was inadequate in light of the Misappropriation.

210.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, with respect to both Proxy Statements, election of directors and ratification of an independent auditor.

211.    The false and misleading elements of the Proxy Statements led to the re-election of Defendants Blank, Gill, Hayman, and Hau, which allowed them to continue breaching their fiduciary duties to Evolus.

212.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

213.    Plaintiff on behalf of Evolus has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

214.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

215.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Evolus' business and affairs.

216.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

217.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Evolus.

218.    In further breach of their fiduciary duties, the Individual Defendants either engaged in, or allowed the Company to engage in the Misappropriation.

219.    In breach of their fiduciary duties owed to Evolus, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the genuine origin of botulinum toxin bacterial strain and the manufacturing process employed to create Jeuveau were misappropriated from Medytox; (2) ample evidence was submitted on record in the ITC Action to support a finding that the Company misappropriated certain trade secrets relating to the botulinum toxin strain and the manufacturing process for the invention of Jeuveau; (3) consequently, there was a serious risk that Evolus would be subject to regulatory and/or court action, banning the import, marketing, and sale of Jeuveau and that the Company's ability to monetize Jeuveau in the

United States would be significantly impaired as a result; (4) all proceeds produced from the commercialization of Jeuveau were the consequence of the Company's misappropriation of certain of Allergan's and Medytox's trade secrets relating to the botulinum toxin strain and the manufacturing process; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

220.    The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

221.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

222.    In yet further breach of their fiduciary duties, during the Relevant Period, two of the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $457,790.

223.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Evolus' securities and disguising insider sales.

224.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Evolus' securities and disguising insider sales.

225.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

226.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Evolus has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

227.     Plaintiff on behalf of Evolus has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for Unjust Enrichment**

228.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

229.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Evolus.

230.     The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales, or received profits, bonuses, stock options, or similar

compensation from Evolus that was tied to the performance or artificially inflated valuation of Evolus, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

231.     Plaintiff, as a shareholder and a representative of Evolus, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

232.     Plaintiff on behalf of Evolus has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

233.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

234.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Evolus, for which they are legally responsible.

235.     As a direct and proximate result of the Individual Defendants' abuse of control, Evolus has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Evolus has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

236.     Plaintiff on behalf of Evolus has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

237.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

238.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Evolus in a manner consistent with the operations of a publicly-held corporation.

239.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Evolus has sustained and will continue to sustain significant damages.

240.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

241.     Plaintiff on behalf of Evolus has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

242.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

243.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

244.     Furthermore, the Individual Defendants caused themselves to receive excessive compensation from the Company given their misconduct, thereby wasting the Company's assets.

245.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

246.    Plaintiff on behalf of Evolus has no adequate remedy at law.

## SEVENTH CLAIM

**Against Defendants Moatazedi, Avelar, and Silvernail for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

247.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

248.    Evolus, along with Defendants Moatazedi, Avelar, and Silvernail are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Moatazedi, Avelar, and Silvernail's willful and/or reckless violations of their obligations as officers and/or directors of Evolus.

249.    Defendants Moatazedi, Avelar, and Silvernail, because of their positions of control and authority as officers and/or directors of Evolus, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Evolus, including the wrongful acts complained of herein and in the Securities Class Action.

250.    Accordingly, Defendants Moatazedi, Avelar, and Silvernail are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

251.    As such, Evolus is entitled to receive all appropriate contribution or indemnification from Defendants Moatazedi, Avelar, and Silvernail.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Evolus, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Evolus;

(c)    Determining and awarding to Evolus the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Evolus and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Evolus and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Evolus to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance

with applicable laws, rules, and regulations.

    (e)    Awarding Evolus restitution from Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated: November 27, 2020        Respectfully submitted,

        **THE BROWN LAW FIRM, P.C.**

        */s/ Timothy Brown*
        Timothy Brown
        Saadia Hashmi
        240 Townsend Square
        Oyster Bay, New York 11771
        Telephone: (516) 922-5427
        Facsimile: (516) 344-6204
        Email: tbrown@thebrownlawfirm.net

## **VERIFICATION**

I, Jairo Lizarau am a plaintiff in the within action. I have reviewed the allegations made in this verified consolidated shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of ___11/15/2020___, 2020.

DocuSigned by:

_____A8132A7DB7DA4EF..._____

Jairo Lizarau